Filed 6/29/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| JAMES O'BRIEN,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE<br>UNIVERSITY OF CALIFORNIA,<br><br>        Defendant and Respondent. | A164481<br><br>(Alameda County<br>Super. Ct. No. RG20075810) |

In March 2020, James O'Brien was suspended from his employment as a professor at the University of California, Berkeley, for violating the University's Faculty Code of Conduct while attending an overseas conference in 2012.  O'Brien received a written censure and one-year suspension for directing unwanted sexualized conduct at a junior colleague attending the conference, a graduate student at Massachusetts Institute of Technology (MIT).  O'Brien filed a petition for writ of mandate to compel the Regents of the University of California (the Regents) to set aside the disciplinary decision, raising procedural, substantive and due process objections.  The trial court denied O'Brien's petition.  We affirm.

We conclude that the University's rule requiring it to initiate disciplinary action within three years of receiving a report of misconduct does not bar the discipline here.  An earlier complaint by a different student only briefly touching on an alleged incident between O'Brien and an unidentified

female MIT graduate student was not a report of the wrong-doing for which he was disciplined. On the merits, substantial evidence supports a finding by the University and the trial court that the MIT student was a "colleague" of O'Brien's, as the Faculty Code of Conduct uses that term, and O'Brien's other attacks on the fairness of the proceedings and his punishment also fail.

## FACTUAL AND PROCEDURAL BACKGROUND

In late 2012, O'Brien attended a week-long computer graphics conference in Singapore hosted by the Special Interest Group on Computer Graphics and Interactive Techniques (SIGGRAPH). O'Brien was a "Director-at-Large" for SIGGRAPH, and one or two of his graduate students at U.C. Berkeley presented papers at the conference. Jane Roe, a first-year Ph.D. student at MIT, also presented a paper. One evening, after the conference ended for the day, O'Brien went to dinner and then to a bar or club with a group of graduate students, including Jane Roe. O'Brien and Roe had no subsequent personal interactions, and years later they vehemently disagreed about what happened that night.

## I. The 2014 Anonymous Complaint

In January 2014, a U.C. Berkeley Ph.D. student completed an anonymous exit survey for departing graduate students, and her response documented concern about a "hostile" and sometimes "sexist" atmosphere in her department's computer graphics research group. The student stated that "[t]he hostile environment was mainly caused by Prof. James O'Brien who regularly insulted students and peer faculty and harassed at least 5 female students." She characterized the incidents as "severe," opined they damaged the research group's outside reputation, and then commented: "To give you an anecdote of how severe these issues are: in a latest incident in December 2011, Prof. O'Brien strongly encouraged a female first year graduate student

2

from MIT to go back to his hotel room with him late at night at a conference." The survey response included no further information about this "anecdote," but characterized O'Brien's behavior as "unacceptable" and "caus[ing] outrage within the community," clearly implying that the advances were unwelcome. Then, in even more summary fashion, the survey respondent added that she knew of three instances since 2006 where students complained to the ombudsman or the department about O'Brien, only to see little come of it.

The anonymous student's complaint about O'Brien was forwarded to the chairs of U.C. Berkeley's Electrical Engineering and Computer Sciences Department, David Culler and Tsu-Jae King Liu, and to Susan Kauer, the department's Executive Director of Student Affairs. Kauer was concerned by the survey response, suspecting there could be an underlying sexual harassment issue or some information the University should investigate. After consulting with an associate general counsel at U.C. Davis about her reporting responsibilities, Kauer reported the matter to U.C. Berkeley's Office for the Prevention of Harassment and Discrimination (OPHD). Department chair Culler was also concerned about sexual harassment and concurred with Kauer that a referral to OPHD was appropriate.

At OPHD, the anonymous student complaint was assigned to William Mallari, who conferred with Culler and Kauer. Mallari advised that OPHD had no record of any other complaint or concern involving O'Brien, and a decision was made that Culler would look into the matter further. Culler surmised the anonymous survey respondent was F.B., a student who had previously expressed similar concerns as those reported in the survey. Culler invited F.B. to have a discussion with him about issues affecting graduate student culture at Berkeley, and during their 15-minute phone conversation,

3

F.B. volunteered that she authored the anonymous survey. F.B. was willing to discuss her concerns regarding her own department but chose not to share further information about the MIT student, saying it was not her place to "bring somebody else in."

On February 11, 2014, Culler met with O'Brien to discuss the anonymous survey response, careful to "position" the meeting as an opportunity to understand the comments, not as an investigation or accusation. O'Brien's "reaction was some blend of resistance and denial." O'Brien also quickly identified F.B. as the likely source of the survey comments, and he denied "pretty much all of the assertions." Specifically with regard to an incident at a conference, O'Brien recalled attending SIGGRAPH Asia in Korea in December 2011, but he "denied that what was in the comments occurred" there and recollected nothing that might have led to this aspect of F.B.'s report, he told Culler. Culler felt that O'Brien took the matter "very very seriously." He encouraged O'Brien to reflect, suggested that he reach out to Will Mallari, and said they "could follow up after a while."

The following day, Culler sent an email to Mallari and Kauer summarizing his discussion with O'Brien. Culler also mentioned to them his conversation with F.B. and said F.B. was willing to discuss the matter further. Kauer and Mallari both replied to Culler's email. Kauer thanked Culler for "taking this issue on, for investigating and for reporting back so thoroughly." She opined that the "matter has been handled well and has been instructive" for O'Brien, and she asked Mallari to let them know if there was anything else they needed to do. For his part, Mallari agreed with Kauer's comments, thanked Culler for approaching the matter with "tact and

4

skill," and invited them both to contact him if they had additional questions or concerns.

## II.  Jane Roe's 2017 Complaint

More than three years later, in December 2017, Jane Roe submitted a complaint about O'Brien to OPHD.  Roe alleged that while she attended the 2012 SIGGRAPH Asia conference (a year later than the conference date F.B. had mentioned), O'Brien engaged her in unwelcome conduct of a sexual nature that affected or interfered with her educational opportunities and created a hostile environment.  Roe reported that she and O'Brien were at a " 'gentleman's club' " following the conference when he touched her lower back and upper thigh, made sexually explicit comments about her appearance, and propositioned her to return to his hotel room.  Roe also reported that after they left the bar, and were in a cab, O'Brien grabbed her arm and insisted on a kiss.  Roe alleged further that during their encounter, O'Brien intimated that Roe had provided sexual favors to secure lead authorship on her paper, and the next morning he invited her to an " 'invite only' " conference in Barbados.

### A.  The OPHD Investigation

In February 2018, OPHD notified O'Brien of its intent to investigate Roe's complaint, and that if her allegations were true O'Brien's behavior could constitute sexual harassment under the University's 2008 Sexual Violence and Sexual Harassment Policy (the 2008 SVSH policy), which was in effect in 2012.  O'Brien objected that the University lacked jurisdiction to investigate Roe's complaint because she had no association to the University community and the incident had no connection with University property, activities, programs, or events.  OPHD disagreed, reasoning that the 2008 SVHS policy was sufficiently broad to reach conduct committed by O'Brien

5

while he was "effectively acting as a representative of UC Berkeley." OPHD also advised O'Brien that, although substantive definitions of prohibited behavior contained in the 2008 SVHS policy would apply, OPHD would conduct its investigation pursuant to procedures in the then-current SVSH policy, which recognized the University's jurisdiction over off-campus conduct that affected the learning or working environment or would violate university policy had it occurred on campus.[1]

O'Brien also objected that the four-year delay in investigating an incident that was reported to the University in 2014 violated the University's own " '[t]hree-year rule.' " O'Brien insisted that he had disclosed Jane Roe's name to then-chair Culler in 2014, and argued that under the Faculty Code of Conduct, also known as APM-015,[2] the University was required to initiate any related disciplinary action within three years. OPHD took the position that a determination whether the three-year rule was violated was beyond its purview, but made findings of fact to facilitate resolution of the matter. Specifically, the OPHD investigator found that O'Brien did not disclose Jane Roe's identity to Culler in 2014, and his contentions to the contrary were not credible.

OPHD's investigation of the 2012 incident included interviewing Roe, O'Brien, and multiple witnesses. OPHD also reviewed witness statements and declarations, as well as emails, chatlogs, social media posts, and local and national news articles about the incident, which Jane Roe had recently

---

[1] The Administrative Record contains three versions of the SVSH policy, adopted respectively in 2008, 2016 and 2019.

[2] APM refers to the University's Academic Personnel Manual, which contains multiple documents, including the Faculty Code of Conduct (APM-015), and the Policy on Faculty Conduct and the Administration of Discipline (APM-016).

made public.  OPHD's file regarding F.B.'s 2014 anonymous complaint was also considered.

According to OPHD's investigation report, O'Brien and Roe agreed on only a handful of general facts:  during the conference, they went out to dinner and some bars with other graduate students, they discussed an upcoming workshop, O'Brien facilitated inviting Roe to the workshop, and there was no further contact between them.  O'Brien disputed all of Roe's allegations regarding inappropriate touching and other misconduct.  Ultimately, the investigator found Roe to be more credible than O'Brien and that "the preponderance of witness statements and documentary evidence support[ed] her version of events."  The investigator also found by a preponderance of the evidence that O'Brien sexually harassed Roe under the terms of the 2008 SVSH policy, in that his conduct was unwelcome, was of a sexual nature, and affected Roe's education, interfering with her education performance and creating a hostile learning environment.

On October 30, 2018, OPHD notified O'Brien it had substantiated allegations that O'Brien violated the 2008 SVSH policy and referred the matter to the Vice Provost for the Faculty, Benjamin Hermalin.  That December, Hermalin notified O'Brien of the University's intention to lodge a formal complaint with the Privilege and Tenure Committee (P&T Committee) charging O'Brien with violating the Faculty Code of Conduct.  Hermalin notified O'Brien that he intended to propose the disciplinary sanction of a three-year suspension, and a commensurate curtailment of his emeritus status should he retire or leave his employment prior to completion of the suspension.

## B. The Disciplinary Complaint

In August 2019, after mediation requested by O'Brien was unsuccessful, Hermalin filed a formal disciplinary complaint with the P&T Committee, charging O'Brien with violating multiple provisions of the Faculty Code of Conduct. First, he was charged with violating APM-015, Part II.C, by committing a "Serious violation of University policies governing the professional conduct of faculty." The stated basis for this charge was that O'Brien's conduct during the 2012 incident violated the 2008 SVSH policy.

O'Brien was also charged with violating APM-015, Part II.D, which provides, in part: " 'As colleagues, professors have obligations that derive from common membership in the community of scholars. Professors do not discriminate against or harass colleagues.' " The University alleged O'Brien violated this provision by, among other things, sexually harassing a then-colleague at the 2012 conference.

The University also charged O'Brien with violating a principle that is illustrated by APM-015, Part II.D.1, which states that professors do not evaluate the professional competence of members of the community of scholars with standards that are not reflective of professional competence. As a basis for this charging allegation, the University invoked a provision in the preamble to APM-015, which states: "Faculty may be subjected to disciplinary action under this Code for any type of conduct which, although not specifically enumerated herein, meets the standard for unacceptable faculty behavior." O'Brien was also charged with violating ethical principles incorporated by reference into the Preamble to APM-015, specifically that professors are to uphold "the best scholarly and ethical standards of their discipline," and to "demonstrate respect for students as individuals and adhere to their proper roles as intellectual guides and counselors."

8

## C. The P&T Committee Hearing and Findings

The P&T Committee held an evidentiary hearing over four days in October and November 2019. In February 2020, the Committee issued a 21-page report of its findings and recommendation, which was submitted to Chancellor Carol Christ.

### 1. Preliminary Findings

During the first day of the hearing, the Committee took evidence regarding O'Brien's procedural objections to the disciplinary complaint, specifically to address (1) whether a violation of the Faculty Code of Conduct could be based on allegations regarding a non-U.C. student at a conference in Singapore, and (2) if the disciplinary action against O'Brien was time-barred under the University's own rules. On October 16, 2019, the P&T Committee issued preliminary findings rejecting O'Brien's procedural objections.

Regarding the first issue, the P&T Committee found that the conduct in question could subject O'Brien to discipline under the Faculty Code of Conduct. The Committee reasoned that several charges against O'Brien allege violations of code provisions that apply to O'Brien's alleged acts "towards a non-UC student at a conference in Singapore" because they contain no "limitation as to geographic location or an exception for activity with a non-UC student." Because the hearing would proceed as to these charges, the Committee found it unnecessary to decide at the preliminary stage whether the 2008 SVSH policy applied to the incident in question.

To resolve O'Brien's claim that the complaint is time-barred, the P&T Committee applied U.C. Academic Senate Bylaw 336.B (Bylaw 336.B), pertaining to the "Time Limitation for Filing Disciplinary Charges," which states: "The Chancellor is deemed to know about an alleged violation of the Faculty Code of Conduct when it is reported to any academic administrator

9

at the level of department chair or above or, additionally, for an allegation of sexual violence or sexual harassment when the allegation is first reported to the campus Title IX Officer.  The Chancellor must file disciplinary charges by delivering notice of proposed disciplinary action to the respondent no later than three years after the Chancellor is deemed to have known about the alleged violation.  There is no limit on the time within which a complainant may report an alleged violation."

The Committee also considered a provision of the Faculty Code of Conduct, APM-015, Part III.A.3.  In 2012, this provision (Former Part III.A.3) stated:  "No disciplinary action may commence if more than three years have passed between the time when the Chancellor knew or should have known about the alleged violation of the Faculty Code of Conduct and the delivery of the notice of proposed disciplinary action."[3]  The Committee did not separately analyze Former Part III.A.3, presumably because it implements Bylaw 336.B.

The Committee found that neither provision bars this disciplinary proceeding.  O'Brien argued that the Chancellor was deemed to know about violations alleged in this case when F.B.'s anonymous survey response was

---

[3] According to the Administrative Record, Part III.A.3 was modified in 2017 to include details from Academic Senate Bylaw 336.B, so that it now states:  "The Chancellor is deemed to know about an alleged violation of the Faculty Code of Conduct when it is reported to any academic administrator at the level of department chair or above.  Additionally, for an allegation of sexual violence or sexual harassment, the Chancellor is deemed to know about an alleged violation of the Faculty Code of Conduct when the allegation is first reported to any academic administrator at the level of department chair or above or the campus Title IX Officer.  The Chancellor must initiate related disciplinary action by delivering notice of proposed action to the respondent no later than three years after the Chancellor is deemed to have known about the alleged violation.  There is no limit on the time within which a complainant may report an alleged violation."

10

forwarded to OPHD in 2014. The Committee rejected this contention, finding "[t]he information that was presented to the Chancellor or her representatives in 2014 was insufficient to constitute alleged sexual harassment and a consequent alleged violation of the Faculty Code of Conduct. Therefore the Chancellor could not have known or [be] deemed to have known of an 'alleged violation' to trigger the three-year rule applicable to the case."

### 2. Findings of Fact About the 2012 Incident

The Committee's final report, issued after the evidentiary phase of the hearing was completed and the matter was submitted for decision, contains detailed findings about O'Brien, Roe, the SIGGRAPH conference they attended, and what happened between them. We briefly summarize the Committee's material findings.

SIGGRAPH hosts the "preeminent conference in the field of computer graphics" and presentations made there "play a prominent role in establishing and advancing academic careers." O'Brien is and was a "leading figure" in the field of computer graphics and in the subfield of physics-based simulation. Roe was a first-year Ph.D. student with a master's degree in computer science when she had a paper accepted and presented it at the SIGGRAPH conference in 2012. On the day Roe presented her paper, she went out to dinner afterwards with O'Brien and a group of his graduate students. Because "meeting colleagues in the field is one of the goals in attending [the conference], especially for students," people often socialize, and it is not unusual for a professor to go out to dinner with a group of students. Roe wanted to pursue a career in physics-based simulation, so meeting O'Brien and his students could lead to an opportunity "for the kind of collaborations that make a career in her chosen field."

11

The dinner that Roe and O'Brien attended was "productive and enjoyable," and afterward a smaller group went out to some local bars. At one point during the "conference-related social occasion at which both professional and personal matters were discussed," O'Brien and Roe were speaking at one end of their table. The other three students in their group were not sitting close enough to hear everything O'Brien and Roe said to each other, and at some point, the others departed. When Roe and O'Brien were alone at the bar, she asked O'Brien for feedback about her presentation earlier that day. O'Brien responded that he hadn't been listening because he was " 'too busy imagining what was under [Roe's] dress.' " O'Brien also insinuated that Roe had been given authorship credit for the paper she presented by manipulating the romantic or sexual interest of her coauthor. O'Brien persisted in such conduct despite Roe's expressed disinterest and effort to deflect his sexualized attention. He tried to get her to go to his hotel room and when they were outside her hotel, he told her she " 'owed' " him a kiss.

"Immediately" after the incident, Roe shared her distress about O'Brien's sexualized remarks and the potential damage to her career with several individuals—her then-romantic partner, her former faculty advisor, and the coauthor of her paper. The following week, she also discussed the incident with a friend and two other Ph.D. students. These communications in the immediate and short-term aftermath of the incident corroborated Roe's account of her interactions with O'Brien, the Committee found. At the hearing, Roe testified that she never felt physically threatened by O'Brien, but "she felt extremely uncomfortable as a 23-year-old in a foreign country, speaking to a powerful person in her field whom she believed could have

12

significant impact on her career, and she testified that the encounter made her feel 'violated' and insecure."

O'Brien did not testify at the administrative hearing, but his statements to OPHD denying the alleged conduct were admitted into evidence, and his denials were confirmed in post-hearing briefing. Ultimately, the Committee found Roe's "testimony convincing in itself, in the absence of counter-evidence, and as verified in her multiple contemporaneous reports to colleagues and friends."

### 3. Findings Regarding Alleged Violations

Before turning to the specific charges against O'Brien, the P&T Committee confirmed its preliminary determination that Roe's allegations could constitute an actionable violation of the Faculty Code of Conduct and made the following additional findings: O'Brien attended the SIGGRAPH conference as a U.C. Berkeley faculty member; the conference is a significant event in the computer graphics field, with formal and informal social occasions constituting a significant aspect of the professional experience; participants at the gathering where the conduct occurred included U.C. Berkeley graduate students presenting research they conducted at O'Brien's lab at U.C. Berkeley; and the participants discussed professional as well as personal matters. The Committee also confirmed its preliminary finding that in 2014, the Chancellor could not be deemed to have known about the violations alleged in this case, albeit with no further analysis.

The Committee then acquitted O'Brien of the first charge it considered: that he had violated the 2008 SVSH policy, a "[s]erious violation of University policies governing professional conduct of faculty," pursuant to APM-015, Part II.C.7. The Committee found O'Brien did not commit this violation because the 2008 SVSH policy, which was in effect when the 2012

13

incident occurred, did not apply to O'Brien's interaction with Roe at SIGGRAPH. The Committee reasoned, the conference was not a University event; it did not take place on University property; Roe was not a member of the University community; and she had no U.C. affiliation.

As to the second charge, however, the Committee found that O'Brien did violate APM-015, Part II.D, which codifies the ethical obligation on professors, deriving from their "common membership in the community of scholars," to "not discriminate against or harass colleagues." The Committee based its conclusion that O'Brien violated this provision on findings that Roe and O'Brien "were not only colleagues both attending the SIGGRAPH Asia conference but also colleagues in the sub-field of physics-based, and particularly cloth, simulation." According to the Committee, Roe "clearly served as a junior colleague" to O'Brien in attending the conference to present a paper in cloth simulation, which was one of O'Brien's specialties, and O'Brien interacted with Roe at a social event associated with the conference "[i]n his role as a Berkeley professor." Moreover, the Committee found, O'Brien's "sexualizing of [Roe] in response to her request for feedback on her scholarly work was a severe violation of collegiality by any standards."

The Committee rejected the remaining charges against O'Brien. With regard to the allegation that he violated the principle in APM-O15, Part II.D.1. that professors should not use inappropriate criteria to evaluate the professional competence of members of the community of scholars, the Committee found the version of the Faculty Code in effect in 2012 made this conduct unacceptable only as to " 'the professional competence of faculty members,' " and Roe was not a faculty member. (Italics omitted.) With regard to the allegation that he violated principles requiring professors to uphold "best scholarly standards" and "demonstrate respect for students as

14

individuals and adhere to [professors'] proper roles as intellectual guides and counselors" (APM-015, Part II.A), the Committee found these policies inapplicable because Roe was "a student at another university and was not under the academic supervision or direction of Professor O'Brien."

### D. Discipline

The Committee recommended that, pursuant to the governing disciplinary guidelines, O'Brien receive a written censure and one-year suspension without pay, opining that the three-year suspension requested by the administration was excessive.

After the Committee completed its report, the Chair wrote to Chancellor Christ to share the Committee's "sense" that an alternative to suspension that more directly addressed O'Brien's misconduct "might be more appropriate." Noting that the Chancellor had authority to impose an alternative sanction if O'Brien consented, the Committee proposed that (1) because O'Brien's violation involved behavior toward a graduate student, he be "prevented from working with new graduate students for a three-year period," and (2) because O'Brien refused to acknowledge his inappropriate conduct, he not be allowed to resume working with graduate students until he received additional training regarding the meaning of sexual harassment and the proper behavior of faculty members in professional relationships with students and colleagues.

On March 11, 2020, Chancellor Christ informed O'Brien of her decision to issue a letter of censure and suspend O'Brien's employment for one academic year, with the advisement that if he decided to retire rather than serve the suspension, she would seek a curtailment of O'Brien's emeritus status under the same conditions outlined in the suspension. In explaining her decision, Christ acknowledged that the P&T Committee did not make

15

findings against O'Brien as to several charges but stated that "[s]exualizing the Complainant in response to her request for feedback on her scholarly work was a serious violation of the Faculty Code of Conduct, which prohibits harassment of colleagues."

## III.  The Writ Proceeding

In October 2020, O'Brien filed a petition for a writ of mandate directing the Regents to set aside the findings of the P&T Committee and the disciplinary sanction imposed by Chancellor Christ.  (Code Civ. Proc., § 1094.5; statutory references are to this code.)  O'Brien alleged that the Regents exceeded their jurisdiction by disciplining him; failed to conduct a fair disciplinary hearing; and abused their discretion by failing to proceed in a manner required by law, making a decision not supported by the findings, and making findings that were not supported by the evidence.

At a July 2021 hearing on the petition, the superior court requested supplemental briefing regarding (1) the three-year rule for commencing a disciplinary action for an alleged violation of the Faculty Rules of Conduct, and (2) whether Jane Roe was a colleague within the meaning of APM-015, Part II.D (Part II.D).  At the continued hearing, the court expressed ongoing concern about whether the Regents failed to comply with their three-year rule and sought additional briefing addressing the history and purpose of the rule.

On November 1, 2021, the court denied O'Brien's petition pursuant to findings subsequently set forth in a final order filed on November 8. Rejecting O'Brien's contention that the Regents violated the three-year rule, the court found that the administrative record supports the P&T Committee's finding that facts known to the Administration in 2014 were "insufficient to constitute a policy violation," and that "sufficient additional facts" were not

16

known until Roe later came forward. The court also found that the record supports the other findings and conclusions of the P&T Committee in this case, among them that "the term 'colleague' includes persons such as the MIT graduate student under the particular circumstances of this matter."

**DISCUSSION**

## I. Issues on Appeal and Standards of Review

Contending his petition for writ of mandate was erroneously denied, O'Brien makes the following claims of error: (1) the University waited too long to file a disciplinary complaint against him; (2) he did not violate the policy prohibiting mistreatment of a colleague; (3) the disciplinary proceeding was unfair; and (4) the sanction imposed on him was excessive. Because the parties disagree about what standards of review govern our resolution of these claims, we begin with a brief review of the pertinent standards.

Section 1094.5 establishes the scope of our review of an adjudicatory decision by an administrative agency. (*Akella v. Regents of University of California* (2021) 61 Cal.App.5th 801, 813–814 (*Akella*).) That review "extends to questions about the agency's jurisdiction to proceed, whether there was a fair trial, and 'whether there was any prejudicial abuse of discretion.' " (*Id.* at p. 813, quoting § 1094.5, subd. (b).) An agency abuses its discretion if it fails to proceed in a manner required by law, if its decision is not supported by the findings, or if its findings are not supported by the evidence. (§ 1094.5, subd. (b).)

"We review the fairness of the administrative proceeding de novo. [Citation.] 'The statute's requirement of a " 'fair trial' " means that there must have been "a fair administrative hearing." ' " (*Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1073 (*Doe v. Regents*); see *Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223

17

Cal.App.4th 72, 96.) Questions of law are also subject to independent judicial review in a mandate proceeding. (*Akella, supra*, 61 Cal.App.5th at p. 815.)

The standard for reviewing an agency's findings of fact can cause confusion. In the trial court, if the administrative decision substantially affects a fundamental vested right, the court must independently review the record to determine whether the weight of evidence supports a factual finding, whereas the substantial evidence test applies when a fundamental right is not at issue. (*Wences v. City of Los Angeles* (2009) 177 Cal.App.4th 305, 313 (*Wences*).) But the appellate court applies a substantial evidence test, regardless of whether a fundamental right is involved. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824.) The difference is that our focus varies with the standard of review employed by the trial court. (*Ogundare v. Department of Industrial Relations* (2013) 214 Cal.App.4th 822, 828 (*Ogundare*).) " 'If a fundamental vested right was involved and the trial court therefore exercised independent judgment, it is the trial court's judgment that is the subject of appellate court review. [Citations.] On the other hand, if the superior court properly applied substantial evidence review because no fundamental vested right was involved, then the appellate court's function is identical to that of the trial court. It reviews the administrative record to determine whether the agency's findings were supported by substantial evidence.' " (*Id.* at pp. 828–829.)

In the present case, O'Brien contends the Chancellor's decision to discipline him affects his fundamental vested right in employment, citing pertinent authority. (See *Wences, supra*, 177 Cal.App.4th at pp. 314–318; compare *Doe v. Regents, supra*, 5 Cal.App.5th at p. 1072 [finding no fundamental vested right affected by college discipline of a student].) But he does not contend that the trial court failed independently to review the

18

administrative record, and he appears to overlook that the substantial evidence test applies to this court's review of the judgment denying his mandate petition. (See *Ogundare*, *supra*, 214 Cal.App.4th at p. 828.) For their part, the Regents characterize virtually every claim of error as a factual dispute reviewable under the deferential substantial evidence test, but assume without explanation that it is University's, rather than the trial court's, factual findings we review for substantial evidence. We disagree with the Regents' analytic approach, although ultimately, we find no basis for setting aside the administrative decision.

## II. The University Did Not Violate Its Three-Year Rule

O'Brien contends the Chancellor's disciplinary decision must be set aside because charges filed against him by Vice Chancellor Hermalin in December 2019 were "time-barred" under the University's rule establishing a time limitation for filing disciplinary charges arising out of an alleged violation of the Faculty Code of Conduct. Like the parties, we refer to this policy as the three-year rule. To resolve O'Brien's claim, we address two distinct issues: the proper interpretation of the University's rule, and whether the rule was violated in this case.[4]

### A. The Proper Interpretation of The Three-Year Rule

O'Brien contends that the P&T Committee misconstrued the University's three-year rule. The proper construction of this rule presents an issue of law, which we must resolve de novo. (*Hoitt v. Department of*

_____

[4] The Regents contend this court lacks jurisdiction to hear this claim because O'Brien failed to exhaust his administrative remedies, but they forfeited any exhaustion defense by failing to present it in the trial court. (*Mission Housing Development Co. v. City & County of San Francisco* (1997) 59 Cal.App.4th 55, 67-68.) Their argument also lacks merit, as O'Brien made the same argument about the three-year rule to the P&T Committee.

*Rehabilitation* (2012) 207 Cal.App.4th 513, 522 (*Hoitt*) [in mandate proceeding, interpretation of regulations is issue of law "for the courts to resolve de novo"]; see e.g., *Akella, supra*, 61 Cal.App.5th at p. 817.)

The three-year rule is contained in two closely related regulatory provisions, Academic Senate Bylaw 336.B and the Faculty Code of Conduct's Part III.A.3. Bylaw 336.B requires that notice of a proposed disciplinary action be given to the respondent "no later than three years after the Chancellor is deemed to have known about the alleged violation," provides that "[t]he Chancellor is deemed to know about an alleged violation . . . when it is reported to" a department chair or certain other individuals, and states specifically that "[t]here is no time limit on the time within which a complainant may report an alleged violation." The Faculty Code of Conduct's implementation of this bylaw is contained in Part III.A.3, which stated in 2012 that "[n]o disciplinary action may commence if more than three years have passed between the time when the Chancellor knew or should have known about the alleged violation of the Faculty Code of Conduct and the delivery of the notice of proposed disciplinary action."

" 'Generally, the rules that govern interpretation of statutes also govern interpretation of administrative regulations,' " as well as the interpretation of "policies promulgated by administrative bodies." (*Akella, supra*, 61 Cal.App.5th at p. 817.) "Further, policies established by the Regents according to their constitutionally derived rulemaking and policymaking power, like the Academic Personnel Manual, have the force and effect of statute." (*Ibid.*) We give regulatory language its plain, commonsense meaning, and read the rule as a whole so that all of its parts are given effect. (*Id.* at p. 818; *Hoitt, supra,* 207 Cal.App.4th at p. 523.)

The central interpretive question this case poses is, what does it mean that "the Chancellor knew or should have known about the alleged violation" (Former Part III.A.3)? Relatedly, what does it mean for "an alleged violation" to be reported to a "department chair" or other specified person (Bylaw 336.B), especially in the context of a skeletal disclosure made by someone making a related complaint? O'Brien argues the information previously reported need only suffice to "put the Chancellor on notice of an alleged violation of the Faculty Code of Conduct," at which point "the onus" is on the University "to investigate the alleged violation and bring charges" within three years. He cites no legal authority for this view, but the phrase "should have known," which appears in Former Part III.A.3, is similar to the concept of inquiry notice used by courts to analyze whether the so-called discovery rule postpones accrual of a civil cause of action until the plaintiff discovers or has reason to discover the cause of action. (*Rosas v. BASF* Corp. (2015) 236 Cal.App.4th 1378, 1390; see, e.g., *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1114 [when discovery rule applies, "limitations period begins when the plaintiff suspects, or should suspect, that she has been wronged"].)

We conclude that "the Chancellor knew or should have known" means something different in the context of the Faculty Code of Conduct. Because the Faculty Code of Conduct implements Bylaw 336.B, we think it important to construe these two provisions together, and we note the bylaw contains no language suggesting the three-year rule runs from the time the University, in the exercise of reasonable diligence, could or should have discovered an alleged violation. Rather, Bylaw 336.B begins the three-year period when "an alleged violation of the Faculty Code of Conduct . . . is reported to" one of several individuals whose knowledge of the report is then imputed to the Chancellor. That is, the bylaw makes the triggering event the receipt of a

21

report of an alleged violation, not the receipt of information from which, with the exercise of reasonable diligence, the University could learn of the alleged violation. We think the proper interpretation of Former Part III.A.3 must be the same: Once the Chancellor knows of an alleged violation, or "should have known" of it *because it was reported to one of her designees* as enumerated in Bylaw 336.B, then notice of the proposed disciplinary action must be delivered within three years. This is both a plausible construction of the language of Former Part III.A.3, and the only construction that is consistent with the bylaw.

We note one other reason for rejecting O'Brien's effort to import a standard of inquiry notice into Former Part III.A.3. In enforcing its Faculty Code of Conduct, the University is not analogous to a civil litigant who must seek legal redress for an injury it has suffered before the statute of limitations has run. The three-year rule dictates how promptly the University must act on reports it receives but, significantly, Bylaw 336.B states "[t]here is no limit on the time within which a complainant may report an alleged violation." After receiving a complaint, the University normally has three years in which to deliver a notice of proposed disciplinary action, no matter how many years in the past the conduct is alleged to have occurred. (Bylaw 336.B.) The University's role is neither that of a public prosecutor nor a private litigant, but of an educational institution committed to maintaining and preserving an environment conducive to higher learning. By limiting to three years the period in which the University must file a disciplinary proceeding, the rule protects the interests of a person who reports misconduct and seeks its timely redress and, at the same time, the interests of one accused of misconduct who wants that complaint to be resolved within a

22

reasonable time.  The three-year rule is a complaint-processing rule rather than a statute of limitations.

Having established that the trigger for the three-year period is that "an alleged violation . . . is reported to" one of the Chancellor's designees (Bylaw 336.B), we must address what it means to report an alleged violation.  How much, or what kind of, information must a report contain before the University is required to treat it as the report of "an alleged violation" sufficient to trigger the three-year rule?  If a report conveying a mere hint of misconduct were construed as sufficient, the Regents would be in the untenable position of having to investigate every rumor that is brought to the University's attention, regardless of its source.  And a person injured by a faculty member's misconduct but not yet prepared to report it to the University could later find her right to redress cut off by someone else's earlier, partial disclosure of some of the facts underlying her claim.  On the other hand, an overly meticulous standard for what a report must contain risks frustrating the salutary purposes of the three-year rule—promoting movement toward resolution of a complaint within a defined period, for the benefit of both the complainant and the accused.

We think a commonsense interpretation of the language of Bylaw 336.B avoids these problems.  When a person lodges a written complaint alleging that he or she is the victim of a specified violation of the Faculty Code of Conduct (e.g., that a named professor sexually harassed the complainant by engaging in described conduct), we think the accusation has been leveled with sufficient particularity that it is an "alleged violation . . . reported to" the person who receives it.  The same is true for a report that, although not accusing a faculty member of violating any particular University policy, relates facts that taken together and on their face violate the Faculty Code of

Conduct. But where a report neither accuses a faculty member of violating a University policy nor sets forth facts that describe such a violation, it is less likely to set the three-year clock running.

We acknowledge that reports of misconduct may come in many different forms, and for that reason decline to set forth a bright-line rule as to when information coming to the attention of the Chancellor, or her designee, constitutes a "report" triggering the three-year period. But we can identify several factors that may influence that determination: (1) the degree of formality of any report, including whether it is written or oral and whether it specifies a University policy alleged to have been violated; (2) the directness of the report, including whether a person allegedly injured by the conduct is reporting it to a person responsible for receiving complaints; and (3) the level of detail in the report, including whether misconduct is spelled out sufficiently to make a violation of the Faculty Code of Conduct apparent and whether names (e.g., of perpetrator and victim(s)) are provided. The question to be answered, in light of these and other facts, is whether a report was made of the "alleged violation of the Faculty Code of Conduct" for which the Chancellor later proposes to discipline a faculty member. (Bylaw 336.B.) The question is *not* whether information that made its way to the Chancellor's designee put the University on notice of misconduct that it could have discovered, if it had undertaken its own investigation.[5]

We glean from the P&T Committee's preliminary findings that the Committee construed the three-year rule in a similar fashion. They

---

[5] We express no view on whether, or under what circumstances, the University might have other obligations to investigate incomplete information about faculty misconduct. We are construing the University's three-year rule for processing reports alleging any kind of violation of the Faculty Code of Conduct, not the University's obligations under, say, Title IX.

concluded, "[t]he information that was presented to the Chancellor or her representatives in 2014 was insufficient to constitute alleged sexual harassment and a consequent alleged violation of the Faculty Code of Conduct" and, as a result, the Chancellor could not be "deemed to have known of an 'alleged violation' to trigger the three-year rule."

The Committee did not further explain its thinking, and we are in any event not bound by the University's interpretation of its own regulations, although that interpretation may warrant deference in certain circumstances. (*Manderson-Saleh v. Regents of University of California* (2021) 60 Cal.App.5th 674, 697.) The degree to which we defer to an agency's interpretation of its own rules is " 'fundamentally situational.' " (*Akella, supra,* 61 Cal.App.5th at p. 816.) Pertinent factors include whether the agency has a comparative interpretative advantage over the courts, and whether it arrived at the correct interpretation. (*Ibid*.) When an agency fails to demonstrate expertise or present developed legal analysis supportive of its interpretation of the procedure in question, that interpretation "does not 'merit[] any measure of presumptive deference.' " (*Teacher v. California Western School of Law* (2022) 77 Cal.App.5th 111, 130.) In this case, the P&T Committee offered no clear construction of the three-year rule, let alone a developed legal analysis in support of a construction. Therefore, we do not defer to the University's interpretation of the Faculty Code of Conduct, although we do take comfort from the P&T Committee's apparent agreement with our own interpretation.

Having resolved this preliminary issue of law, we turn to the parties' factual dispute about whether the three-year rule was violated in this case.

25

**B. Disciplinary Charges Were Filed Within Three Years**

O'Brien contends the P&T Committee's finding that the University did not violate the three-year rule is "not supported by evidence in the record." According to O'Brien, the record compels a contrary finding because "the anecdote regarding Jane Roe" was disclosed in F.B.'s exit survey, which was reported to OPHD in January 2014. The flaw in this argument is that O'Brien focuses on a fragment of F.B.'s disclosure describing O'Brien's alleged behavior with Jane Roe rather than on F.B.'s actual complaint, which pertained to an allegedly toxic environment at U.C. Berkeley. O'Brien overlooks undisputed evidence in the administrative record that he was the subject of two distinct complaints, brought by two different complainants, alleging violations of University policy.

The first complainant, F.B., alleged that O'Brien created a hostile environment within F.B.'s research group at U.C. Berkeley. F.B.'s "anonymous" complaint was reported to the chair of O'Brien's department and to OPHD in January 2014, and thus the Chancellor was deemed to know about it at that time. Undisputed evidence further shows that F.B.'s complaint was investigated informally, and more than three years passed without any notice to O'Brien that disciplinary charges would be pursued. Thus, the three-year rule precludes the Regents from disciplining O'Brien based on F.B.'s complaint that O'Brien created a hostile environment within the U.C. Berkeley research group in (and before) 2014.

But a second person, Jane Roe, came forward to make a substantively different complaint about O'Brien in 2017. Roe was never a U.C. student, and she was not complaining about the academic environment at U.C. Berkeley. Her complaint was about O'Brien's treatment of her during an international conference held in 2012. As the pertinent bylaw explicitly

states, there was no time limit as to when Roe could make her claim. The record also clearly shows that the University initiated a formal disciplinary proceeding against O'Brien within the three-year period after receiving Roe's report.

We recognize, of course, that although F.B.'s response to the exit survey primarily complained about O'Brien damaging the learning environment in, and the reputation of, her research department, it *also* disclosed a few facts Jane Roe would later report. Specifically, F.B. disclosed that "in December 2011, Prof. O'Brien strongly encouraged a female first year graduate student from MIT to go back to his hotel room with him late at night at a conference." But F.B. misidentified the conference, omitted the name of the MIT student, and did not—in this single sentence—sufficiently describe a violation of the Faculty Code of Conduct for which the University later proposed to discipline O'Brien.

In particular, F.B.'s report did not describe O'Brien as harassing and discriminating against a junior colleague. F.B. did not mention, for example, that the MIT student shared an academic sub-specialty with O'Brien and was seeking professional feedback from him on her conference presentation, so that she was acting in the role of an academic colleague. F.B. did not disclose that O'Brien's "strong[] encourage[ment]" was so unwelcome as to interfere with the MIT student's working or learning environment, such that the conduct might be characterized as harassment or discrimination. And F.B. did not mention any misconduct other than strong encouragement to return to O'Brien's hotel room, such as the unwanted physical touching and sexualized response to her request for academic feedback that Jane Roe later described. These omitted facts are ones Jane Roe might be expected to include in her own report, if and when she chose to complain to the

27

University; but they were not reported in F.B.'s single-sentence "anecdote" illustrating how O'Brien was harming the reputation of the University's research group. Indeed, F.B. disclosed *none* of the facts that so concerned Chancellor Christ when she eventually disciplined O'Brien for the "serious violation" of "[s]exualizing the Complainant in response to her request for feedback on her scholarly work" from a "colleague[]."

Considering the factors we have identified above, we conclude substantial evidence supports the trial court's finding that the University's disciplinary complaint against O'Brien was timely filed. F.B.'s complaint was quite formal in that it was in writing, but it was aimed at a different violation of University policy, namely the creation of a hostile and sexist learning environment in the University's computer graphics research group. To the extent F.B.'s report addressed O'Brien's conduct toward Jane Roe, it was informal in that it did not allege a violation of University policy, and indirect in that Jane Roe did not make the report or request F.B. to report on her behalf. Also, F.B.'s complaint lacked an appropriate level of detail regarding O'Brien's interaction with Jane Roe, omitting much of the information necessary to establish a prima facie violation of the Faculty Code of Conduct. Because F.B. did not report or allege a violation of the Faculty Code of Conduct with regard to Jane Roe, she did not start the three-year clock running as to the complaint Jane Roe made in 2017, and we accordingly affirm that the three-year rule was not violated in this case.

## III. O'Brien Violated APM-015, Part II.D

Turning to the merits, O'Brien challenges the finding that he violated the ethical principle incorporated into Faculty Code of Conduct Part II.D., which states: "As colleagues, professors have obligations that derive from common membership in the community of scholars. Professors do not

discriminate against or harass colleagues.  They respect and defend the free inquiry of associates.  In the exchange of criticism and ideas professors show due respect for the opinions of others.  Professors acknowledge academic debts and strive to be objective in their professional judgment of colleagues.  Professors accept their share of faculty responsibilities for the governance of their institution."

O'Brien contends he did not violate Part II.D because (1) Jane Roe was not his colleague, and (2) any interaction he may have had at the SIGGRAPH conference would not constitute actionable harassment or discrimination under this provision of the Faculty Code of Conduct.  Again, we will address separately O'Brien's arguments about what the Code means and his arguments about what the evidence shows.

## A.  The Meaning of "Colleagues"

O'Brien argues the Committee's finding that Roe was O'Brien's colleague in 2012 subverts the language of Part II.D.  He reasons that the dictionary defines a colleague as an associate or co-worker who is "often" of an equal rank, and posits that the term is clearly used in the Faculty Code to refer exclusively to other U.C. Berkeley professors.

The Faculty Code of Conduct does not define the term colleague, and we disagree that it necessarily refers only to individuals of the same rank, i.e., other professors, let alone professors from the same university.  As the P&T Committee observed, the rule could easily have been limited to that discrete group if such was its intent, by stating that, as colleagues, professors do not discriminate against or harass other U.C. Berkeley professors, and that they defend the free inquiry of these other professors.  Instead, the ethical principle in Part II.D is broadly worded in stating that professors do not discriminate against or harass "colleagues," that they defend the free

29

inquiry of "associates," and they respect the opinions of "others." These quoted terms certainly encompass other U.C. Berkeley professors, but the fact that other professors are colleagues does not mean that only professors are colleagues. We have no doubt that the community of scholars making important contributions to the academic fields in which professors operate includes graduate students. That is precisely why graduate students are invited to present papers at international academic conferences.

O'Brien relies on the fact that the Faculty Code of Conduct sets forth "Types of Unacceptable Conduct" that violate ethical principles pertaining to colleagues; he contends the examples given all involve mistreatment of another professor. As a factual matter, this may be incorrect. The fourth example of unacceptable conduct is "[b]reach of established rules governing confidentiality in personnel procedures." (APM-15, Part II.D.4.) If this example is somehow limited to personnel procedures involving faculty members, that is not apparent from its text.[6] But more fundamentally, O'Brien's argument ignores the explicit design of this code, which designates enumerated types of unacceptable conduct as examples of conduct that "presumptively are subject to University discipline." (See APM-015, Part II, p. 5.) The Code makes clear that "[o]ther types of serious misconduct," although not "specifically enumerated," may be the basis for disciplinary action if that conduct is not "justified" by the ethical principles and

---

[6] Perhaps recognizing as much, O'Brien inexplicably expands his definition of "colleagues" to encompass "other UC Berkeley faculty *or personnel*," when commenting on this example in Part II.D.4, although he otherwise limits the reach of the rule to " 'professors,' particularly professors at UC Berkeley" or, when discussing the history of APM-015, "faculty and university administrators."

"significantly impairs the University's central functions as set forth in the Preamble" to the Code. (*Ibid.*)

According to the Preamble, the central functions of the University are to "provide and sustain an environment conducive to sharing, extending, and critically examining knowledge and values, and to furthering the search for wisdom." These worthy goals require that faculty members respect and defend fellow members of the community of scholars, without regard to whether those individuals are U.C. Berkeley professors, graduate students collaborating on University-sponsored research, or academics from other institutions presenting at international academic conferences. O'Brien does not suggest that any ethical principle in the Faculty Code of Conduct "justifie[s]"—or otherwise places beyond censure—discrimination or harassment if the victim is not affiliated with U.C. Berkeley. Nor could he plausibly maintain that professors must "acknowledge academic debts" only when they borrow from the work of other U.C. Berkeley professors. Surely attribution must be given, when due, to the work of academics from other institutions, and to U.C. Berkeley graduate students who assist in a professor's research. By rejecting O'Brien's construction of "colleagues" as limited to other U.C. Berkeley professors, the Committee construes its own rules in a manner that avoids impairing the central functions of the University.

O'Brien also contends that the Committee's interpretation of Part II.D is inconsistent with evidence of the "history" of the Faculty Code that was filed in the writ proceeding in response to the trial court's request for further briefing. The Regents object to us considering this regulatory history on the ground that it was not introduced into evidence at the administrative hearing before the P&T Committee. The Regents ignore that this regulatory history

31

evidence is part of the appellate record because they filed it in the writ proceeding, and that the trial court relied on it when ruling on the mandate petition.  In any event, O'Brien cites nothing in this regulatory history that addresses the ethical principles he was found to have violated, or the specific definition of the word "colleagues" as used in the Faculty Code's recitation of these principles.  Thus, this evidence does not change our analysis or conclusion.

For all these reasons, we affirm the P&T Committee's conclusion, adopted by the trial court, that the word "colleagues" in Part II.D does not apply exclusively to other U.C. Berkeley professors but may include, in an appropriate case, an MIT graduate student.  Here, the Regents' interpretation of their own rule merits at least a modicum of consideration in light of their comparative expertise on the role of graduate students in the community of scholars, and it is consistent with the language of, and furthers the policies underlying, the Faculty Code of Conduct.

## B. The Meaning of "Discriminate" and "Harass"

O'Brien contends the finding he discriminated against or harassed Roe within the meaning of Part II.D must be set aside because it conflicts with the Committee's finding that O'Brien did not violate the 2008 SVSH policy.[7] O'Brien reasons that if his conduct at the SIGGRAPH conference did not constitute discrimination or harassment under the 2008 SVSH policy, it necessarily follows that the exact same conduct did not constitute discrimination or harassment under Part II.D.  We disagree with this logic, which misreads the Committee's findings.  The Committee found that the

---

[7] Because the trial court affirmed and adopted the Committee's findings of fact, we review those findings for substantial evidence.  O'Brien's argument here, however, is that the Committee erred as a matter of law by making internally inconsistent findings.

2008 SVSH policy did not apply in this case because the policy reached only conduct that occurred in University programs and activities, or between members of the University community. Because the policy did not apply, the Committee made no finding as to whether O'Brien's conduct would otherwise meet the definitions of harassment and discrimination as those terms were used in the 2008 SVSH policy.

Making essentially the same argument a different way, O'Brien contends there is no evidence to support a finding that "harassment" and "discrimination" are defined in Part II.D more expansively than in the 2008 SVSH policy. Again, the finding that the 2008 SVSH policy does not apply does not relate to the nature of O'Brien's conduct, but to the facts that Jane Roe had no affiliation to the University, and the SIGGRAPH conference was not a University event. These undisputed facts are dispositive when considering whether O'Brien violated the 2008 SVSH policy because the policy expressly limited its application to "incidents between any members of the University community, including . . . non-student or non-employee participants in University programs . . ." No such restrictions appear in the language of Part II.D, as the Committee found. And we reject O'Brien's effort to import such a restriction by reference to "the University's central functions as set forth in the Preamble." The University does not "sustain an environment conducive to sharing . . . knowledge and . . . furthering the search for wisdom" by countenancing its professors' harassment of colleagues from other academic institutions. (APM-015, Part II, p.5.)

### C. The Challenged Findings Are Supported by the Evidence

O'Brien contends the finding that Roe was his "academic colleague at the time the alleged conduct occurred is . . . untenable." (Italics omitted.) The Committee did not find that Roe and O'Brien were academic colleagues

33

of equal rank, but rather that Roe was a junior colleague of O'Brien's when they participated in the 2012 SIGGRAPH conference. The Committee made extensive findings of fact that support this conclusion: The SIGGRAPH conference was prestigious and a top academic gathering in the field of computer graphics; Roe made a presentation at the conference, which was considered "a milestone in the advancement of her career"; O'Brien specialized in the subfield that was the subject of Roe's paper; O'Brien interacted with Roe at a social event associated with the conference "[i]n his role as a Berkeley professor"; and, during the interaction, professional matters were discussed.

O'Brien does not attempt to show that any of these facts are unsupported by the record, but argues instead that a distinction should be drawn between a professor's role at a conference and at a private club after the conference ends for the day. He points to no regulatory language drawing that distinction or limiting application of the ethical principles pertaining to treatment of colleagues to specific locations or times of day. To be sure, there may be cases in which a faculty member attending a professional conference during the day goes out at night and engages in conduct unrelated to his role as a faculty member. But O'Brien makes no such showing here, and he ignores evidence establishing a nexus between the SIGGRAPH conference and the incident at the bar in which he mistreated Roe. That evidence shows that the reason Roe and O'Brien were at the bar together was because they were attending a conference at which O'Brien was a prominent professor and Roe was his junior colleague. When that day's session of the conference ended, O'Brien went out with a group of graduate students who were all attending the conference, and Roe was anxious to network with O'Brien and his students because making those connections could enable "the kind of

34

collaborations that make a career in her chosen field," as the P&T Committee found. And indeed, Roe and O'Brien discussed professional matters in the bar.

O'Brien also contends in summary fashion that "mere non-collegial treatment of others" does not constitute harassment or discrimination under Part II.D or any other University policy. The P&T Committee found, and the trial court affirmed, that the following interactions occurred: When Roe requested "a professional evaluation of her presentation," O'Brien "sexualized her, replying that he had not been paying attention to her words but instead had been imagining what was under her dress." O'Brien also "insinuated" that Roe obtained the honor of first authorship on her paper by "manipulat[ing] the romantic or sexual interest of her co-author." When Roe made additional requests for "feedback on her scholarly work," O'Brien continued to sexualize the conversation and "persisted in his conduct" despite Roe's efforts to deflect O'Brien's "sexualized attention" and her "expressions of disinterest." We understand that O'Brien continues to deny these interactions occurred, but he does not show that the Committee's findings to the contrary are unsupported by evidence presented at the administrative hearing. These findings, in turn, support the conclusion ultimately reached by the Committee and the trial court that O'Brien harassed and/or discriminated against a junior colleague.

## IV. The Disciplinary Proceeding Was Fair

O'Brien challenges the fairness of the University's disciplinary procedure, presenting two distinct sets of arguments. O'Brien contends first that he was not provided legally sufficient notice that his conduct at the SIGGRAPH conference could potentially result in discipline by the

University. O'Brien cites no authority supportive of this claim of error and his specific legal theory is not readily apparent.

"Notice of the charges sufficient to provide a reasonable opportunity to respond is basic to the constitutional right to due process and the common law right to a fair procedure." (*Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, 1445.) But O'Brien does not dispute here that he received notice of the disciplinary charges filed against him, including the charge that he violated Part II.D. If O'Brien is suggesting that Part II.D is too vague to satisfy due process standards of fairness, his point is not well-taken. In the context of statutes, due process requires sufficient clarity to provide a standard against which conduct can be uniformly judged. (*Gutknecht v. City of Sausalito* (1974) 43 Cal.App.3d 269, 273.) " 'It is not required that a statute, to be valid, have that degree of exactness which inheres in a mathematical theorem. It is not necessary that a statute furnish detailed plans and specifications of the acts or conduct prohibited.' " (*Id*. at p. 274.) Here, PART II.D articulates ethical principles relating to a faculty member's treatment of a colleague, which are sufficiently clear to provide a standard against which conduct can be uniformly judged.

O'Brien does not seriously contend he was denied notice that harassment and discrimination of a colleague are impermissible under the Code. His real objection is that he did not realize he could be punished for engaging in such improper conduct while attending a conference that the University did not sponsor. In this regard, O'Brien opines that the Faculty Code should specifically address whether conduct at conferences is subject to discipline. O'Brien is free to pursue the argument elsewhere, but it does not support his contention that the proceeding in this case was unfair due to lack of notice. As the P&T Committee observed, many provisions of the Faculty

36

Code, including the provision O'Brien violated, do not contain limitations as to geographical location or exceptions for misconduct committed against a person who is not directly affiliated with the University.

Finally, O'Brien intimates that the University lacked jurisdiction to discipline him for conduct that allegedly had no effect on the University or its reputation. In this regard, O'Brien disputes the Committee's finding that O'Brien attended the conference as a U.C. Berkeley professor, but his rejoinder that he attended as a SIGGRAPH affiliate is beside the point. The record shows that when O'Brien attended the conference, he was a prominent and influential U.C. Berkeley faculty member in the specific field of study that was the subject of the conference. O'Brien had been actively involved with SIGGRAPH for many years, had students from his lab presenting papers at the conference, and felt that, as a faculty member, it was important that he attend the conference. The misconduct that resulted in this disciplinary proceeding occurred at the conclusion of an evening during the conference, which O'Brien spent with his students from U.C. Berkeley as well as a graduate student working in his same academic sub-specialty. This evidence shows that O'Brien interacted with Jane Roe as a U.C. Berkeley professor, whether or not he was also SIGGRAPH affiliated, and that his conduct during the interaction did reflect on the University, as the P&T Committee found.

With his second set of arguments, O'Brien contends he was denied his right to a fair hearing. In presenting this argument, O'Brien relies on authority discussing the minimum standards for providing a fair hearing in a student disciplinary proceeding. (Citing *Doe v. Allee* (2019) 30 Cal.App.5th 1036.) The Regents contend that because this case involves discipline of a faculty member as opposed to a student, different standards of procedural

37

fairness should apply, but they offer no reason for this view, nor do they articulate alternative standards.

O'Brien contends specifically, that the University violated his fair hearing rights by appointing a single individual at OPHD to investigate Roe's complaint and make findings of fact without conducting an evidentiary hearing. In some other context, such a procedure could raise fairness concerns. But here, the role of OPHD was simply to make a preliminary determination: whether probable cause existed to file a disciplinary proceeding against O'Brien. Tellingly, O'Brien does not dispute that once the University filed a disciplinary complaint, he was afforded a full evidentiary hearing before the P&T Committee, where he had the opportunity to present evidence and call and cross-examine witnesses. His appellate argument that the P&T Committee simply adopted the findings of the OPHD investigator is unfounded, as it is unsupported by any factual analysis and ignores the procedural record, which we have summarized above.

Acknowledging at least implicitly that he was afforded a full administrative hearing before the P&T Committee, O'Brien argues that hearing was unfair because the University acted on behalf of Roe, and withheld evidence from O'Brien's counsel until the hearing was underway. This argument is not developed to the point that O'Brien contends prejudicial error occurred. O'Brien also asserts the hearing was unfair because the Committee sustained relevancy objections to inquiries about Roe's mental health, but he fails to show that any specific ruling by the Committee was erroneous, let alone prejudicial.

## V. The Sanction was not Excessive

Finally, O'Brien contends that a one-year suspension was "a constitutionally excessive fine," in that it caused him to forego $270,000 in

salary and benefits. But O'Brien does not develop the constitutional argument, and the law on administrative fines is not in his favor. "The propriety of a sanction imposed by an administrative agency is a matter resting in the sound discretion of that agency, and that decision will not be overturned absent an abuse of discretion. [Citations.] 'Neither a trial court nor an appellate court is free to substitute its discretion for that of an administrative agency concerning the degree of punishment imposed.' [Citations.] This rule is based on the rationale that 'the courts should pay great deference to the expertise of the administrative agency in determining the appropriate penalty to be imposed.' " (*Hughes v. Board of Architectural Examiners* (1998) 68 Cal.App.4th 685, 692.) "Moreover, '[i]t is only in the exceptional case, when it is shown that reasonable minds cannot differ on the propriety of the penalty, that an abuse of discretion is shown.' " (*Doe v. Regents*, *supra*, 5 Cal.App.5th at p. 1106.)

O'Brien fails to show that the sanction imposed was improper under these standards. He contends that Chancellor Christ based her decision on the mistaken belief that he had violated the 2008 SVSH policy, when the record shows the Chancellor made no such mistake. He also contends that the Chancellor "negate[d]" the Committee's recommendation to impose an alternative sanction, which is also unsupported by the record. As we have noted, the Committee recommended, and the Chancellor imposed, a one-year suspension instead of the three-year suspension sought by the University. Explaining why it believed the University's proposal was too harsh, the Committee recognized that O'Brien's "misconduct was serious, and he [had] yet to acknowledge that it occurred," but pointed out that several years had passed and no subsequent reports of misconduct had been made. By the same token, however, the Committee rejected O'Brien's proposed sanction of

an admonishment instead of suspension.  Guided by the University's Administration of Discipline policy (APM-016), the Committee found that a sanction with a "rationale" relevant to the charges would be a written censure and one-year suspension.

To be sure, when the Committee forwarded its final report to the Chancellor, it not only confirmed its recommendation of a one-year suspension but also proposed—perhaps even encouraged—an alternative sanction of restricting O'Brien's ability to work with graduate students rather than suspending his employment.  But Chancellor Christ's decision to impose the recommended one-year suspension and written censure instead of the proposed alternative did not negate the Committee's recommendation, and it was not an abuse of the Chancellor's discretion.

## DISPOSITION

The judgment is affirmed.

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.

*O'Brien v. The Regents of the University of California* (A164481)

40

Trial Court: Alameda County Superior Court

Trial Judge: Hon. Paul D. Herbert

Counsel: Hathaway Parker, Mark M. Hathaway and Jenna E.
Parker for Plaintiff and Appellant

Munger, Tolles & Olson, Halyn J. Chen, April D. Youpee-
Roll, Stephanie G. Herrera; and Katharine Essick for
Defendant and Respondent